SiteLink Software, LLC v. Red Nova Labs, Inc., 2018 NCBC 87.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

SITELINK SOFTWARE, LLC,

Plaintiff,

v.

RED NOVA LABS, INC.,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 9922

**ORDER & OPINION ON
MOTIONS FOR PARTIAL SUMMARY
JUDGMENT**

1. THIS MATTER is before the Court on cross-motions for summary judgment by Plaintiff SiteLink Software, LLC ("SiteLink") and Defendant Red Nova Labs, Inc. ("Red Nova"). For the reasons discussed below, the respective motions are GRANTED in part and DENIED in part.

> *Daughtry, Woodard, Lawrence & Starling, by Luther D. Starling, Jr., and LedoLaw, by Michele A. Ledo, for Plaintiff SiteLink Software, LLC.*
>
> *Morningstar Law Group, by J. Christopher Jackson, John T. Kivus, and Shannon R. Joseph, for Defendant Red Nova Labs, Inc.*

Gale, Judge.

## I. INTRODUCTION

2. This dispute concerns two companies that provide and develop software for the self-storage industry—the industry in which facility owners and operators rent storage units to tenants. SiteLink provides facility-management software ("FMS") to self-storage facility owners. Red Nova provides FMS and lead-generation and website-development products.

3.     SiteLink's FMS requires certain computer hardware and software to be installed.   SiteLink licenses an Application Programming Interface ("API") to ancillary service providers like Red Nova to access data for mutual customers.   For customers that use both SiteLink's FMS and Red Nova's lead-generation or website products, Red Nova uses the API to access and retrieve customer data.

4.     Use of the API is governed by a license, the terms of which SiteLink has updated at various times.   Initially, the license required users to disclose conflicts of interest they have with SiteLink.   Later, SiteLink added a non-compete provision. SiteLink contends that Red Nova violated both versions of the license, and both parties contend that the other defamed it in the course of competition.

## II.   PROCEDURAL HISTORY

5.     SiteLink instituted this action by filing its Verified Complaint for Preliminary Injunction, Permanent Injunction and Other Relief in the Wake County District Court.   After Red Nova filed its Answer, Defenses, Counterclaims, and Supplemental Motion to Transfer, the case was transferred by consent to the superior court division, after which Red Nova filed a Notice of Designation seeking to have the case designated as a complex business case.   The Chief Justice designated the case as a mandatory complex business case on October 28, 2014, and the case was assigned to the undersigned on October 29, 2014.

6.     On May 4, 2015, the Court entered a Consent Preliminary Injunction granting Red Nova certain limited use of SiteLink's API.

7.     The Court allowed an amended complaint ("Amended Complaint") on August 4, 2015, which asserts claims for (1) trade-secret misappropriation, (2) violations of the Computer Fraud and Abuse Act ("CFAA"), (3) computer trespass, (4) breach of contract, (5) unjust enrichment, (6) tortious interference with existing contractual relations, (7) tortious interference with prospective contracts, (8) libel, (9) unfair or deceptive trade practices, and (10) declaratory judgment.

8.     Red Nova answered the Amended Complaint and asserted counterclaims for (1) tortious interference with contract, (2) anticipatory repudiation of contract, (3) defamation, (4) unfair or deceptive trade practices, and (5) state antitrust violations.

9.     The Court dismissed Red Nova's counterclaims for antitrust violations and anticipatory repudiation of contract, and dismissed Red Nova's counterclaims for unfair or deceptive trade practices and tortious interference with contract to the extent they were based on SiteLink's license being unlawful. *See SiteLink Software, LLC v. Red Nova Labs, Inc.*, No. 14 CVS 9922, 2016 NCBC LEXIS 45, at *35 (N.C. Super. Ct. June 14, 2016).

10.     Both parties have moved for partial summary judgment. SiteLink seeks summary judgment on its own claims for breach of contract, unjust enrichment, libel, tortious interference with existing contracts, misappropriation of trade secrets, violations of the CFAA, and unfair or deceptive trade practices, and against Red Nova's remaining counterclaims for defamation per se, tortious interference with

contract, and unfair or deceptive trade practices. Red Nova moves for summary judgment on all of SiteLink's claims.

11. There are other motions that are not addressed in this Order & Opinion, including SiteLink's several motions claiming that Red Nova should be held in contempt because it has violated the terms of the Consent Preliminary Injunction.

12. The motions for summary judgment are ripe for disposition.

### III. FACTUAL BACKGROUND

13. The Court makes no findings of fact but summarizes the following undisputed and contested facts to provide context for its ruling. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975). Further background is provided in the Court's prior Order & Opinion dismissing some of Red Nova's counterclaims. *SiteLink*, 2016 NCBC LEXIS 45, at *4–6.

### A. The Parties

14. SiteLink is a North Carolina technology company that has provided FMS to the self-storage industry since the 1990s. Its FMS helps facility operators manage rentals, revenue, and accounting, among other things. SiteLink's FMS is server-based, and its API allows other software providers to access SiteLink customers' data. SiteLink's API includes "specifications," which are "the code necessary to retrieve information from" SiteLink's FMS. (Pl's. Mem. L. Supp. Mot. Partial Summ. J. 3 ("Pl's. MSJ Br."), ECF No. 74.)

15. Red Nova is a technology company founded in Kansas City, Kansas, in 2009. (Aff. Daniel A. Miller ¶ 2, Jan. 23, 2015, ("Miller Aff."), ECF No. 17.) Red

Nova's initial internet-based software products targeted lead generation and website development. Red Nova used SiteLink's API when working with SiteLink's customers. Red Nova later developed its own FMS platform. (Miller Aff. ¶¶ 11–13.)

**B.    SiteLink's Licenses**

16.    It is common for self-storage facility owners to use both an FMS platform for primary management and other third-party software programs for ancillary services. Third parties can communicate with SiteLink's FMS by importing or exporting information manually, using SiteLink's web template to link a facility owner's website to SiteLink's servers, or accessing SiteLink's API, which allows a third party's application to interface directly with SiteLink's FMS.

17.    SiteLink employs two licenses, one for its API, and another for its FMS.

**(1)    SiteLink's API License**

18.    Before July 2011, users seeking to use SiteLink's API would make an e-mail request to Luke Lenzen, SiteLink's Chief Technology Officer. Mr. Lenzen would screen for conflicts and provide approved users access to specifications necessary to use the API. (Lenzen Dep. June 23, 2016, 25:13–26:12, ("Lenzen Dep."), ECF No. 75.9.) The API specifications contain a footer that reads: "Copyright© 2008 SiteLink® All rights reserved. This API and any reproduction and/or distribution in whole or in part without permission is prohibited." (Pl's. MSJ Br. Ex. 9, ECF No. 75.4.)

19.    On July 12, 2011, SiteLink implemented version 1.0 of an API license, ("API License 1.0"), and conditioned continued usage of the API on agreement to the licensing provisions. (Lenzen Dep. 34:11–37:6.) API License 1.0 stated that the "User

agrees that User will disclose to SiteLink any conflicts of interest or potential conflicts of interest User may have in a timely manner." (Pl's. MSJ Ex. 6 § 9 ("API License 1.0"), ECF No. 75.8.) It also stated that "[a]ny and all licenses contained in this agreement shall terminate automatically without notice if User fails to comply with any provisions of this Agreement," (API License 1.0 § 7), and prohibited users from externally storing tenant e-mail addresses or other information sent or received from SiteLink. (API License 1.0 § 3(N).) After July 12, 2011, any time SiteLink provided the API specifications, it included the operative API license. (Lenzen Dep. 34:18–20.)

20. Although SiteLink states that this "should not" have been the case, (Lenzen Dep. 33:2–3), the API specifications were for a time available via a URL internet portal. The portal was not generally visible to the public on the internet, however, it was also not password protected or otherwise restricted at certain times, including between November 26, 2013 and April 5, 2015. (Lenzen Dep. 32:7–34:1–2.)

21. On April 28, 2014, SiteLink implemented version 2.1 of the API license ("API License 2.1"). API License 2.1 provided that an API user shall "[n]ot compete directly, or through an affiliate company, or through [sic] related third party with SiteLink," or "operate in conflict of interest to SiteLink, or in a manner detrimental to the reasonable business interests of SiteLink." (Pl's. MSJ Ex. 8 ("API License 2.1") §§ 3(R), (S), ECF No. 75.1.) API License 2.1 also contained, as did API License 1.0, the requirement that licensees disclose to SiteLink any potential conflicts of interest that the licensee had with SiteLink, (API License 2.1 § 10), and a self-executing

termination provision in the event a licensee breached any provision of the license. (API License 2.1 § 7.)

**(2)    SiteLink's FMS Customer License**

22.    Since at least January 1, 2014, SiteLink has conditioned usage of its FMS on agreement to a customer license ("Customer License"). (Pl's. MSJ Ex. 5, Aff. Luke Lenzen Supp. Pl's. Mot. Partial Summ. J. Sept. 19, 2016 ¶ 4, ECF No. 75.9.) This license states that SiteLink "may suspend" the customer's "right and license to use the software" if the customer or a "related third party operate in competition" or in a "conflict of interest" with SiteLink. (Pl's. MSJ Ex. 64, at 2, ECF No. 81.3.)

**C.    Red Nova Uses SiteLink's API and Develops Its Own FMS.**

23.    Sometime in or around 2009, Red Nova began providing internet-based lead-generation and website products, and used SiteLink's API to provide those products to users of SiteLink's FMS.

24.    Mr. Lenzen provided Red Nova an API license key by December 20, 2011. (Pl's. MSJ Br. Ex. 11, ECF No. 76.) API License 1.0 was in effect at this time.

25.    Red Nova asserts that, during the course of providing its internet-based products, it perceived keen customer interest in an improved FMS product that would help facility owners better manage the day-to-day business at their self-storage facilities while also better integrating with Red Nova's existing lead-generation and website products. In or around April 2012, Red Nova's CEO, Daniel Miller ("Miller"), contacted SiteLink's COO, Markus Hecker ("Hecker"), and suggested that their two

companies collaborate to develop a more integrated product. Hecker declined. (Pl's. MSJ Ex. 2, Miller Dep. Nov. 18, 2014, 92:3–25, ("Miller Dep."), ECF No. 75.3.)

26.     The parties dispute whether, during the course of these discussions or at any time thereafter, Miller advised Hecker that Red Nova intended to develop an FMS platform to compete against SiteLink's platform. SiteLink contends that Miller only disclosed that Red Nova would "keep trying to make sense of how best to meet the marketing needs of the smaller operators" without indicating one way or another that it would pursue its own FMS product. (Pl.'s MSJ Br. Ex. 14, ECF No. 76.6.) Red Nova contends that Miller informed Hecker that Red Nova was "hoping to develop a management software product." (Miller Aff. ¶ 7.)

27.     Red Nova began developing its own FMS in 2013, when API License 1.0 was in effect. In January 2014, Red Nova released the "beta" version of its FMS called storEDGE. Red Nova executed a general release to customers of storEDGE in April 2015, after SiteLink had implemented API License 2.1. (Def's. Answer, Defenses, Am. Countercls. Pl's. First Am. Compl. ¶ 24, ECF No. 35.)

**D.     SiteLink Discovers Red Nova's Competition, Plans to Block API Access, and Grants an Express Limited License.**

28.     SiteLink contends that it discovered Red Nova's development of storEDGE on October 29, 2013, when a mutual customer, Guardian Storage, requested certain data from SiteLink for Red Nova to run a test on storEDGE. Hecker called Red Nova to ask if Red Nova was building FMS, and Red Nova declined to "talk about it." (Banks Dep. June 8, 2016 85:10–11, ECF No. 75.2.) SiteLink then independently confirmed that Red Nova had developed storEDGE.

29.     SiteLink maintains that upon discovering Red Nova's development of storEDGE, SiteLink's initial reaction was to cut off Red Nova's API access, (Pl's. MSJ Ex. 25, ECF No. 77.3), but, because terminating Red Nova's API access would have disrupted the web services of some of SiteLink and Red Nova's mutual customers, SiteLink did not immediately block Red Nova's API access.  (Pl's. MSJ Br. 7; Pl's. MSJ Ex. 1, Lampe Dep. June 22, 2016, 138:16–139:24 ("Lampe Dep."), ECF No. 75.)

30.     On January 13, 2014, SiteLink began calling customers that it believed were using Red Nova's and SiteLink's services to advise them that Red Nova had violated the API license and, beginning February 28, 2014, SiteLink intended to block Red Nova's lead-generation and website-products customers from accessing the API. On January 15, 2014, SiteLink sent a letter to mutual customers with the same message: beginning February 28, 2014, SiteLink intended to block customers of Red Nova's lead-generation and website products from accessing SiteLink's API.  (Pl's. MSJ Ex. 30, at 1, ECF No. 77.2.)  As part of its plan to transition customers away from Red Nova, SiteLink provided Red Nova with a limited license to use SiteLink's API for mutual customers between January 13, 2014 and February 28, 2014 (the "Express Limited License").  The parties dispute the terms and duration of this license.

31.     Ultimately, SiteLink did not block mutual customers' API access. (Fourth Aff. Daniel A. Miller ¶ 24, Nov. 9, 2016, ("Fourth Miller Aff."), ECF No. 118.)

**E.    The Parties Further Communicate with Their Customers.**

32.    In addition to its January 15, 2014 letter, SiteLink stated in January 2014 in front of customers at a trade show that Red Nova had stolen SiteLink's proprietary information and used it to develop storEDGE. (Def. Red Nova Labs, Inc.'s Resp. Pl's. Mot. Partial Summ. J. 30 ("Def's. MSJ Resp."), ECF No. 119; Dep. Alexander Bernath 52:13–14, 53:23–54:17 ("Bernath Dep."), ECF No. 119.1.)

33.    Between January 13, 2014 and February 28, 2014, Red Nova contacted some mutual customers and encouraged them to obtain extensions from SiteLink for API access. (Pl's. MSJ Ex. 31, RNL06018, RNL06019, RNL05511, ECF No. 78.)

34.    On April 21, 2014, Hecker stated to a customer via e-mail that SiteLink was "recovering from flagrant, shameless theft and abuse of our API by Red Nova." (Def's. MSJ Resp. Ex. E, ECF No. 121.6.)

**F.    The Court Enters a Consent Preliminary Injunction and Red Nova Issues a Press Release.**

35.    On May 4, 2015, the parties proposed and the Court entered a Consent Preliminary Injunction temporarily enjoining Red Nova from accessing SiteLink's API, except for certain programs that mutual customers used as of November 1, 2014.

36.    The day that the Court issued the Consent Preliminary Injunction, Red Nova issued a press release titled "Court Order Protects Red Nova and its storEDGE Customers" ("Press Release"). (Pl's. MSJ Ex. 49, ECF No. 79.5.) The Court more fully discusses the Press Release below in its analysis of SiteLink's defamation claim.

## IV. STANDARD OF REVIEW

37.     Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2017). "Summary judgment is improper if any material fact is subject to dispute." *Culler v. Hamlett*, 148 N.C. App. 389, 391, 559 S.E.2d 192, 194 (2002). The movant bears the burden of proving the lack of a triable issue. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Once the movant has met that burden, the burden shifts to the nonmoving party to produce a forecast of evidence that demonstrates facts showing that it can establish a prima facie case at trial. *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 407, 742 S.E.2d 535, 540 (2012). The Court must view all the presented evidence in the light most favorable to the nonmoving party. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707.

## V.     ANALYSIS

### A.     The Court Properly Considers Claims Not Expressly Pled but Supported by the Developed Record.

38.     The Court first addresses Red Nova's contentions that the Court should ignore some parts of the record when ruling on the summary judgment motions, and that SiteLink seeks to avoid summary judgment by raising and arguing claims that are not stated in the Amended Complaint.

39.     More specifically, Red Nova challenges SiteLink's reliance on allegations that (1) Red Nova's use of SiteLink's API between May 2013 and January

2014 was unlicensed; (2) Red Nova's use of SiteLink's API between February 28, 2014, and November 1, 2014, was unlicensed; (3) Red Nova misappropriated information using SiteLink's API for reasons other than developing storEDGE; and (4) Red Nova committed computer fraud by accessing information other than SiteLink's trade secrets. (Def's. MSJ Resp. 7–8.) SiteLink admits that its Amended Complaint did not expressly assert some of these affirmative claims, but contends that they are based on and supported by the evidence presented in connection with the summary judgment proceedings and are properly considered. (Pl.'s MSJ Br. 19 n.106.)

40. The Court has discretion whether to consider SiteLink's claims beyond those expressly stated in the pleadings. "Where the evidence presented at a summary judgment hearing would justify an amendment to the pleadings, [courts] will consider the pleadings amended to conform to the evidence raised at the hearing." *Stephenson v. Warren*, 136 N.C. App. 768, 771, 525 S.E.2d 809, 811 (2000). If necessary, a court may consider allowing an amendment to conform to evidence presented. N.C. Gen. Stat. § 1A-1, Rule 15(b) (2017). *See Whitten v. Bob King's AMC/Jeep, Inc.*, 292 N.C. 84, 90, 231 S.E.2d 891, 894 (1977). Granting "summary judgment for variance between allegation and proof . . . subvert[s] Rule 15(b) and run[s] contrary to the policy of the new rules which are designed to eliminate procedural technicalities and encourage trial on the merits." *Hardison v. Williams*, 21 N.C. App. 670, 673, 205 S.E.2d 551, 553 (1974).

41. At least for purposes of determining whether Red Nova is entitled to summary judgment against SiteLink on all claims, the Court, in its discretion and

based on its review of the entire record, concludes that the Amended Complaint gave Red Nova fair notice of the claims for which it now claims unfair surprise and that, as a result, the Court may properly consider SiteLink's arguments based on claims that arise from the evidence, whether or not such claims have yet been formally pled.

42. As to whether the Amended Complaint gave notice of SiteLink's contention that Red Nova's access to the API was unlicensed at all times after it began competing (except during the period between January 13, 2014 and February 28, 2014), the Amended Complaint clearly alleges that API License 1.0 prohibited competing without disclosing, that Red Nova began to compete with SiteLink no later than Spring 2013, (Am. Compl. ¶¶ 20, 54–56, 62–63, 124–25, 129–35, ECF No. 29), and that Red Nova did not disclose its competition to SiteLink in violation of API License 1.0. (Am. Compl. ¶ 124.) The Amended Complaint also alleges that SiteLink allowed Red Nova access to the API only for a "short transition period, through February 28, 2014," (Am. Compl. ¶ 56), and that Red Nova's competition after April 28, 2014 constituted a breach of API License 2.1. (Am. Compl. ¶ 126.) The Amended Complaint also clearly placed Red Nova on notice of SiteLink's contention that Red Nova gained improper access to technical data and customer data through unauthorized use of the API. (Am. Compl. ¶¶ 47–48.) Discovery likewise delved into these factual areas. It is then proper for the Court to consider these matters as it considers the respective summary judgment contentions. In doing so, the Court has carefully sought to match any alleged conduct to the API license in effect when that conduct occurred, although the parties have not consistently done so.

**B.** **Any Claim that Red Nova Improperly Copied or Distributed SiteLink's Copyrighted Materials is Preempted by the Copyright Act, but Claims not Based on Unauthorized Copying or Distribution are not Preempted.**

43. SiteLink's Amended Complaint alleges that Red Nova breached the API licenses by "using and/or reproducing SiteLink's Trade Secrets in an unauthorized manner." (Am. Compl. ¶ 125). Emphasizing this phrase from SiteLink's allegations, Red Nova contends that at least portions of SiteLink's breach-of-license claims should be preempted by the United States Copyright Act. *See* 17 U.S.C. § 301(a) (2012) ("Copyright Act"); (Def. Red Nova Labs, Inc.'s Mem. L. Supp. Mot. Partial Summ. J. 18–20 ("Def's. MSJ Br."), ECF No. 88.) Red Nova also asserts that SiteLink's unjust enrichment and trade secrets claims are preempted by the Copyright Act. (Def's. MSJ Br. 18–20 (unjust enrichment); Def's. MSJ Resp. 26–27 (trade secrets).)

44. The Copyright Act preempts state law claims to the extent that such claims assert rights "equivalent to any of the exclusive rights within the general scope of copyright" granted under the Act. 17 U.S.C. § 301(a) (2012). These rights include the copyright holder's rights to: reproduce the copyrighted work; copy or distribute the work; prepare derivative works; or display the work publicly. *Id.* § 106(1)–(4). For a state contract claim to be preempted, the cause of action must be "within the subject matter of copyright law" as specified in sections 102 and 103 of the Act, and "the rights protected by state law" must be "equivalent to any of the exclusive rights granted by" section 106 of the Copyright Act. *Out of the Box Developers, LLC v. LogicBit Corp.*, No. 10 CVS 8327, 2012 NCBC LEXIS 55, at *20 (N.C. Super. Ct.

Oct. 30, 2012) (citing *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 229 (4th Cir. 1993)).

45.     If a state law claim includes an extra element that makes the right asserted by the claim "qualitatively different from a copyright infringement claim," the Copyright Act does not preempt the state law claim. *Rosciszewski*, 1 F.3d at 230; *see also Out of the Box Developers*, 2012 NCBC LEXIS 55, at *20–21. Thus, "the vast majority of contract claims will presumably survive scrutiny," but "preemption should continue to strike down claims that, though denominated 'contract,' nonetheless complain directly about the reproduction of expressive materials." *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 351 F. Supp. 2d 436, 443 (M.D.N.C. 2005) (quoting *Frontline Test Equip., Inc. v. Greenleaf Software, Inc.*, 10 F. Supp. 2d 583, 593 (W.D. Va. 1998)). Accordingly, the Court must examine "the precise contract rights being asserted." *Madison River*, 351 F. Supp. 2d at 443.

46.     SiteLink claims that Red Nova breached three contracts: API License 1.0, the Express Limited License, and API License 2.1. (Pl's. MSJ Br. 16–17.) SiteLink maintains that Red Nova breached API License 1.0 by "continu[ing to] *use* SiteLink's API" when it was developing the competing product storEDGE without disclosure to SiteLink, (Pl's. MSJ Br. 16 (emphasis added)), and by storing tenant e-mail addresses externally. (Pl's. MSJ Br. 18 n.103.) SiteLink contends that Red Nova breached the Express Limited License when it encouraged mutual customers to ask for "indefinite extensions" of the period in which Red Nova was allowed to access the API in order to assist those customers, in violation of an implied obligation to aid

those customers' transitions. (Pl's. MSJ Br. 19.) Finally, SiteLink argues that Red Nova breached API License 2.1 by competing with SiteLink. (Pl's. Resp. Def's. Mot. Partial Summ. J. 3 ("Pl's. MSJ Resp."), ECF No. 115.3.) Although the primary gravamen of SiteLink's contract claims is wrongful use and bad faith, not copying or distribution, Red Nova argues that many of SiteLink's claims are nevertheless altogether preempted because they "relate to software." (Def's. MSJ Br. 18.)

47. A breach-of-contract claim asserting violations of a software license agreement "raises issues that lie at the intersection of copyright and contract law." *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010) (quoting *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1122 (9th Cir. 1999)). Software programs are clearly subject to copyright protection, *Madison River*, 351 F. Supp. 2d at 442, but the "use" of copyrighted material does not necessarily fall within the Copyright Act's purview—and is therefore not preempted—unless the use involves one of the rights delineated in section 106, which are primarily copying or distribution. *Id.* at 443 (preempting a breach-of-contract claim that included "daily *copying* the TCS data base and permitting [its] employees to use the . . . copy of the TCS data base") (emphasis added). In other words, some "use" of a copyrighted work may fall within the parameters of those exclusive rights, but not all "use" of copyrighted material is governed and preempted by the Copyright Act. The following example from the Federal Circuit is illustrative:

> [C]onsider a license in which the copyright owner grants a person the right to make one and only one copy of a book with the caveat that the licensee may not read the last ten pages. Obviously, a licensee who made a hundred copies of the book would be liable for copyright infringement

> because the copying would violate the Copyright Act's prohibition on reproduction and would exceed the scope of the license. Alternatively, if the licensee made a single copy of the book, but read the last ten pages, the only cause of action would be for breach of contract, because reading a work does not violate any right protected by copyright law.

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1316 (Fed. Cir. 2005).

48. The Court is aware of cases that, when read beyond their factual context, use broader language that may suggest that mere use of a copyrighted work after a license expires might sometimes fall within the scope of the Copyright Act. *See, e.g.*, *Nichols Agency, Inc. v. Enchanted Child Care, Inc.*, 537 F. Supp. 2d 774, 783 (D. Md. 2008) (holding that an allegation of a daycare's "continued use" of a television commercial after the expiration of an agreement was "substantively similar" to a claim for copyright infringement); *Madison River*, 351 F. Supp. 2d at 443 (preempting a contract claim based in part on the defendant "permitting [its] employees to *use* the . . . copy of the . . data base"). However, these cases also recognize that contract claims based on an express promise to pay for excess use of copyrighted material, *are* qualitatively different from copyright claims and are not preempted by the Act. *Nichols Agency,* 537 F. Supp. 2d at 784; *Madison River*, 351 F. Supp. 2d at 443–44; *see also Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir.1988) (holding that a breach-of-contract claim for failure to either purchase a home designed by the plaintiff-architect or return the designs to him was not preempted by the Act); *Pan-Am. Prods. & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664, 694,

M.D.N.C. 2011) (holding that a breach-of-contract claim based on a failure to pay fees after using copyrighted material was not preempted).

49. The authorities, read collectively, instruct that the Copyright Act generally preempts breach-of-license claims only if the claims demand proof that a party copied or distributed copyrighted material at a time it was not licensed to do so. Thus, SiteLink's breach-of-license claims are not preempted to the extent they depend only on continued use of software that was initially copied or distributed within the terms of the API licenses SiteLink granted to Red Nova and do not require proof of further copying or distribution. Stated otherwise, unless Red Nova's alleged continued use of or access to the API included its *additional* copying or distribution of SiteLink's copyrighted materials beyond what SiteLink initially allowed Red Nova to copy or distribute as an authorized licensee, SiteLink's breach-of-license claims, including those based on Red Nova's competition, failure to report its competition, and external storage of e-mail addresses, depend on contractual rights outside of the exclusive rights provided by the Copyright Act and are not preempted by the Act.

50. The same reasoning applies to SiteLink's unjust enrichment claim. To succeed on a claim for unjust enrichment, "a party must prove that it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously. . . ." *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002). Generally, "a state law cause of action for unjust enrichment or quasi contract should be regarded as an 'equivalent right' and hence, pre-empted insofar as it applies to copyright subject matter."

1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 1.01(B)(1)(g). That is, if the act relating to unjust enrichment is no more than copying or distribution, the claim is preempted.

51. However, "a plaintiff's [unjust enrichment] claim may survive a preemption challenge if [the] plaintiff [can] demonstrate that defendants were unjustly enriched by 'material beyond copyright protection.'" *Pan-Am.*, 825 F. Supp. 2d at 695 (quoting *Microstrategy, Inc. v. Netsolve, Inc.*, 368 F. Supp. 2d 533, 537 (E.D. Va. 2005)). As with contract claims, preemption of unjust enrichment claims depends on the gravamen of the claim. *Pan-Am.*, 825 F. Supp. 2d, at 695.

52. Here, the thrust of SiteLink's unjust enrichment claim is that Red Nova "benefitted from its unlicensed API access without paying for this benefit." (Pl's. MSJ Br. 20.) As the Court reads the record, SiteLink does not assert, and has not shown, that Red Nova was unjustly enriched by distributing, copying, or publicly displaying the API. In other words, SiteLink does not assert that Red Nova was unjustly enriched "as a result of the wrongful exercise of [SiteLink]'s § 106 rights." *Pan-Am.*, 825 F. Supp. 2d, at 695. Rather, the gravamen of SiteLink's unjust enrichment claim is that Red Nova did not pay for, and benefitted from, its continuous unauthorized API access while developing its own FMS. Claims based on a failure to pay for excess use of copyrighted material are qualitatively different from copyright claims governed by section 106 and are not preempted by the Copyright Act. *See Acorn Structures*, 846 F.2d, at 926; *cf. Sparrow Sys. v. Private Diagnostic Clinic, PLLC*, No 14 CVS 1025, 2014 NCBC LEXIS 70, at *28 (N.C. Super. Ct. Dec. 24, 2014) (holding that because

the plaintiff sought "to disgorge [the d]efendant of benefits derived through . . . alleged deceitful conduct that does not entail the mere copying of [the p]laintiff's software," an unjust enrichment claim was not preempted). The Court concludes that SiteLink's unjust enrichment claim is not preempted by the Copyright Act.

53. The Court also concludes that SiteLink's trade secrets claim is not preempted. To succeed on a claim for trade secret misappropriation, a plaintiff must show that the information alleged to be a trade secret "(a) derives independent actual or potential commercial value from not being generally known . . . and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3) (2017). Because North Carolina trade secret claims require the element of secrecy, which is absent from copyright claims, "North Carolina causes of action for trade secret misappropriation and unfair [or] deceptive trade practices based on such misappropriation are not preempted by the Copyright Act." *Out of the Box Developers*, 2012 NCBC LEXIS 55, at \*21 (citing *Forest2Market, Inc. v. Am. Forest Mgmt., Inc.*, No. 3:05-cv-423, 2008 U.S. Dist. LEXIS 33185, at \*15 (W.D.N.C. 2008)); *see also* 1 Nimmer on Copyright § 1.01 ("Actions for disclosure and exploitation of trade secrets require a status of secrecy not required for copyright and hence, are not pre-empted."); *GlobeRanger Corp. v. Software AG United States of America, Inc.*, 836 F.3d 477, 486 (5th Cir. 2016) (collecting cases and noting that "all ten [federal] circuits that have considered trade secret misappropriation claims have found them not preempted by the Copyright Act"). Accordingly, the Court concludes that SiteLink's trade secrets claim is not preempted.

54.     In sum, SiteLink's breach-of-contract claims are only preempted to the extent that such claims require proof of unauthorized copying or distribution of copyrighted material.  SiteLink's unjust enrichment and trade secrets claims are not preempted.

## C.     Summary Judgment on SiteLink's Claims

### (1)     Red Nova is entitled to summary judgment that it did not misappropriate SiteLink's FMS source code, but there are genuine issues of fact that preclude summary judgment for either party on SiteLink's remaining trade secrets claims.

55.     SiteLink and Red Nova each seek summary judgment on SiteLink's trade secrets claims.

56.     SiteLink alleges three categories of trade secrets: its FMS, current product information, and new product information, (Am. Compl. ¶¶ 73, 81, 89), but moves for summary judgment only to the extent Red Nova misappropriated current and new product information as contained in SiteLink's API specifications.  (Pl's. MSJ Br. 27 n.148.)  SiteLink argues that the undisputed evidence shows that Red Nova used SiteLink's API specifications to gather information about the most "efficient and effective way to write [Red Nova's] own API."  (Pl's. MSJ Br. 27–28.)

57.     Red Nova denies SiteLink's evidentiary conclusion and contends, in addition to its preemption argument, that SiteLink's misappropriation claim fails for two reasons: first, there is no evidence that Red Nova actually used SiteLink's FMS; and second, information other than SiteLink's FMS does not deserve trade secret protection because SiteLink voluntarily published the information or failed to take reasonable steps to protect its secrecy.  (Def's. MSJ Br. 9–16.)

58.     A trade secret is "business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process" that: (1) "[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use," and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  N.C. Gen. Stat. § 66-152(3) (2017).

59.     The Court considers several factors in determining whether information is a trade secret, including

> (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 567–68, 754 S.E.2d 852, 858 (2014) (quoting *Area Landscaping, LLC v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 525, 586 S.E.2d 507, 511 (2003)); *see also RoundPoint Mortg. Co. v. Florez*, No. 13 CVS 8803, 2016 NCBC LEXIS 18, at *28–29 (N.C. Super. Ct. Feb. 18, 2016).

60.     Information that might otherwise qualify as a trade secret will not be protected if the party asserting misappropriation fails to satisfy its "affirmative duty to take reasonable measures to maintain the information's secrecy."  *Glaxo Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280, 1300 (E.D.N.C. 1996).  Whether a party took reasonable efforts to maintain the secrecy of its trade secrets is "necessarily fact

dependent, and courts that have addressed it closely examine the circumstances surrounding the trade secret to determine what measures are reasonable." *Koch Measurement Devices, Inc. v. Armke*, No. 12 CVS 3478, 2015 NCBC LEXIS 45, at \*15 (N.C. Super. Ct. May 1, 2015).

61.     Having reviewed the complete record, the Court concludes that there is no evidence to support a finding that Red Nova misappropriated SiteLink's FMS code. Assuming, without deciding, that SiteLink's FMS code is a trade secret, there is no evidence that Red Nova had access to SiteLink's FMS code via the API specifications or otherwise, and SiteLink admits as much. (Lampe Dep. 19:1–8, ECF No. 89.4.) Accordingly, the Court concludes that Red Nova is entitled to a summary adjudication that it did not misappropriate SiteLink's FMS source code.

62.     In contrast, there is an evidentiary dispute as to whether the evidence would support a finding that Red Nova misappropriated SiteLink's information concerning its products and systems contained in its API specifications. (Lampe Dep. 50:9–54:22; 58:6–59:8; 90:8–91:24.) Red Nova appears to concede that at least portions of such information might be entitled to trade secret protection had they been reasonably safeguarded from public access. (Def's MSJ Br. 14–15.) However, Red Nova contends that SiteLink forfeited any right to trade secret protection because it did not take reasonable steps to protect its API specifications from disclosure. (Def's. MSJ Br. 14–15.)

63.     SiteLink's procedures for accessing its API have progressed through several "iterations." (Lenzen Dep. 25:8–9.) Before July 2011, access to SiteLink's

API was available by e-mailing Mr. Lenzen and requesting access. (Lenzen Dep. 25:10–17.) Beginning in July 2011, SiteLink began sending out its API license (which included a non-disclosure agreement and a copyright notification) with other API documentation that customers requested. (Lenzen Dep. 34:11–20.) SiteLink additionally authorized some customers to access a URL that housed the API. (Lenzen Dep. 32:16–23.) The URL was not publicly visible, but was also not password protected and was apparently accessible to anyone with internet access from at least November 26, 2013 to April 5, 2015. (Lenzen Dep. 32:7–34:2.)

64. SiteLink, relying on Judge Bledsoe's opinion in *Taidoc Tech. Corp v. OK Biotech Co.*, No. 12 CVS 20909, 2016 NCBC LEXIS 26 (N.C. Super. Ct. Mar. 28, 2016), asks the Court for a summary adjudication that its API protection policies were reasonable as a matter of law. SiteLink's reliance on *Taidoc* is misplaced. In *Taidoc*, Judge Bledsoe examined the policies of a corporation seeking to protect its alleged trade secrets and concluded that the corporation's draft agreements containing confidentiality provisions, confidentiality labels, and requirement to have a third party execute non-disclosure agreements prior to disclosing the corporation's information were insufficient to show as a matter of law that the corporation failed to take reasonable measures. *Id.* at \*19–26. *Taidoc* does not stand for the converse proposition that these efforts were adequate, reasonable measures as a matter of law. The burden remains on SiteLink to show that there is no genuine issue of material fact regarding the reasonableness of its trade secret policies, and SiteLink has not met that burden and is therefore not entitled to summary judgment in its favor.

65.     As to Red Nova's motion, it has failed to demonstrate that SiteLink's efforts to protect its API were unreasonable as a matter of law. Admittedly, SiteLink's efforts to protect its API were not optimal, but the Court concludes that they are adequate to create a genuine issue of fact, and that a jury must determine the reasonableness of SiteLink's efforts to protect its API. *See Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, No. 13 CVS 1037, 2015 NCBC LEXIS 40, *27–28 (N.C. Super. Ct. Apr. 23, 2015) (holding that "[m]aintaining password protection for a computerized database" is a way to take adequate measures, but that "without other demonstrated efforts [it] may not be adequate to meet the obligations imposed by the North Carolina Trade Secrets Protection Act").

66.     In sum, neither party is entitled to summary judgment on SiteLink's misappropriation of trade secrets claim other than on SiteLink's FMS source code.

### (2)     <u>There are genuine issues of fact as to whether Red Nova violated the Computer Fraud and Abuse Act.</u>

67.     Both parties seek a summary adjudication on SiteLink's claim that Red Nova violated section a(2)(C) of the CFAA, 18 U.S.C. § 1030(a)(2)(C) (2012). SiteLink brought claims based on other CFAA sections but does not ask for summary judgment on them. (Pl's. MSJ Br. 29 n.163.) SiteLink's CFAA claim is based on its allegation that Red Nova improperly accessed SiteLink's servers after Red Nova launched a competitive FMS platform, with the exception that continued access was authorized during: (1) the period between January 13, 2014 and February 28, 2014; and (2) after May 4, 2015, so long as Red Nova's use was consistent with the Consent Preliminary Injunction. (Pl's. MSJ Br. 29–30.)

68.     The CFAA provides a private civil right of action against one who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," and incurs "loss from a related course of conduct . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(a)(2)(C), (c)(4)(A)(i)(I), (g). A "protected computer" includes computers "used in or affecting interstate or foreign commerce or communication." *Id.* § 1030 (e)(2)(B). One "exceeds authorized access" by "access[ing] a computer with authorization and us[ing] such access to obtain . . . information in the computer that the accesser is not entitled so to obtain." *Id.* § 1030(e)(6). In general, a "loss" is "any reasonable cost to the victim, including the cost of responding to an offense," *id.* § 1030(e)(11), that is "related to fixing a computer." *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004); *see also Dishner v. Goneau*, No. 15 CVS 473, 2017 NCBC LEXIS 7, at *15 (N.C. Super. Ct. Jan. 30, 2017).

69.     It appears uncontested that SiteLink's servers are "protected computers" under the CFAA and that Red Nova accessed SiteLink's servers via SiteLink's API. (Pl's. MSJ Exs. 41, 46; Def's. MSJ Br. 17) (admitting that Red Nova used SiteLink's API "to access the data").) The dispute centers on whether that access was authorized.

70.     The federal circuit courts have taken different approaches in determining when one does not have authorization to access a computer. Some circuits construe "without authorization" to prohibit access by an employee who has authority to access the employer's information but exploits that access to gather

information against the employer's interest. *See Int'l Airport Ctrs., LLC v. Citrin,* 440 F.3d 418, 420–21 (7th Cir. 2006). Other circuits have stated that misuse of information to which a user has authorized access falls outside the CFAA. *See United States v. Nosal,* 676 F.3d 854, 863 (9th Cir. 2012). In *WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199 (4th Cir. 2012), the Fourth Circuit adopted the latter approach, construing the CFAA to provide that a person

> is authorized to access a computer when [the party with control over the computer] approves or sanctions his admission to that computer. Thus, he accesses a computer "without authorization" when he gains admission to a computer without approval. Similarly . . . [a person] "exceeds authorized access" when he has approval to access a computer, but uses his access to obtain or alter information that falls outside the bounds of his approved access. Notably, neither of these definitions extends to the improper *use* of information validly accessed.

*WEC*, 687 F. 3d at 204 (citations omitted). In *WEC*, the Fourth Circuit rejected a CFAA claim because the plaintiff had not alleged that the defendants' use of the protected computer was unauthorized, but had asserted only that the defendants' use of information from the computer violated company policy. *Id.* at 205–07.

71. Red Nova relies on *WEC* to argue that its access was not unauthorized even if inconsistent with the express limitations stated in direct conversations between SiteLink and Red Nova. In part, Red Nova relies on an affidavit of Miller, which states that "[s]ince the Court entered the injunction," Red Nova used the API only to work with mutual customers. (Miller Aff. ¶ 5, Sept. 28, 2016, ECF No. 67.1.) The Court did not enter the Consent Injunction until May 4, 2015.

72. For the periods prior to May 4, 2015, Red Nova contends that the evidence supports a conclusion that SiteLink authorized Red Nova's access to

SiteLink's servers through the API out of concern for SiteLink's customers even assuming that Red Nova had launched its competitive FMS platform without disclosing its conflict of interest. (Def's. MSJ Resp. 15–16.) Red Nova contends that SiteLink's Amended Complaint admits that SiteLink authorized Red Nova's access if needed by mutual customers. (Def's. MSJ Resp. 17, referring to Am. Compl. ¶ 106.) Even so, SiteLink has evidence that it contends shows that Red Nova accessed the API for customers who were not mutual. (Pl's. MSJ Exs. 41, 46, 47, 48.)

73.     The Court concludes that there remains a genuine issue of fact whether Red Nova accessed SiteLink's servers when it had no authority to do so.

74.     Red Nova also contends that SiteLink has not suffered the requisite $5,000 loss necessary to give it a right to bring a civil action under the CFAA, claiming that SiteLink's expenses in implementing a license key system to monitor API usage merely brought SiteLink up to "standard practice" in the industry. (Def's. MSJ Resp. 23–24.) The Court finds this argument unpersuasive, as the record appears clear that SiteLink incurred such expenses in direct response to Red Nova's continued access, (*see* PL's. MSJ Ex. 65, Aff. Ross. W. Lampe Supp. Pl's. Mot. Partial Summ. J. Sept. 19, 2016 ¶ 6, ECF No. 81.7), such that SiteLink's costs likely constitute a "loss" under the CFAA. *See A.V. v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009) (holding that the economic damages provision of the CFAA "contemplates . . . costs incurred as part of the response to a CFAA violation"). Proof of damages is not, however, sufficient alone. The issue of Red Nova's authority to access SiteLink's servers precludes any summary adjudication.

**(3)** **Red Nova is not entitled to summary judgment on SiteLink's computer trespass claim.**

75. SiteLink asserts a claim for computer trespass in violation of N.C. Gen. Stat. § 14-458 (2017). (Am. Compl. ¶¶ 118–121.) Only Red Nova seeks summary judgment on this claim based on its contention that the claim is "wholly dependent" on SiteLink's trade secrets claim. (Def's. MSJ Br. 16.)

76. First, SiteLink has not limited its computer trespass claim to the copying of its trade secrets. (Pl's. MSJ Resp. 9.) Second, the Court has held that SiteLink's trade secrets claim survives summary judgment. Accordingly, Red Nova is not entitled to summary judgment on SiteLink's computer trespass claim.

**(4)** **Neither party is entitled to summary judgment on SiteLink's breach-of-contract claims, which are not preempted.**

77. Both parties move for summary judgment on SiteLink's breach-of-contract claims, which are based on API License 1.0, the Express Limited License, and API License 2.1. Red Nova has not challenged the validity of any of these licenses.

78. Under North Carolina law, a breach-of-contract claim requires "(1) [the] existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citing *Jackson v. Carolina Hardwood Co.*, 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995)).

**a.** **Alleged breaches of API License 1.0**

79. Regarding API License 1.0, SiteLink asserts that Red Nova failed to timely disclose any conflicts of interest or potential conflicts of interest that Red Nova

had, in violation of section 9 of API License 1.0. (API License 1.0 § 9; Am. Compl. ¶ 124.) This violation, SiteLink asserts, triggered section 7 of API License 1.0, which provides that "all licenses contained in this Agreement shall terminate automatically without notice if [Red Nova] fails to comply with any provisions of this Agreement." (Pl's. Ex. 6 § 7.) SiteLink points to Red Nova CEO Miller's statement in January 2013 that Red Nova was "walking a fine line between working with [SiteLink] and competing with them," (Pl's. MSJ Ex. 16, ECF No. 76.2), as evidence that Red Nova knew it had a conflict of interest and did not disclose it. (Pl's. MSJ Br. 18.)

80.    As to API License 1.0, which does not have a competition clause, Red Nova argues that it disclosed its intentions to develop an FMS product such that it never triggered the self-executing termination provision. (Def's. MSJ Resp. 12–13.) Red Nova contends that Miller disclosed to SiteLink in Fall 2012 Red Nova's intention to develop its own FMS. (Def's. MSJ Br. 17; *see also* Miller Aff. ¶¶ 7–10 ("The way I presented it to [SiteLink] was that [Red Nova] intended to proceed with exploring strategic partnerships as necessary to [develop a more cost-effective FMS].").)

81.    The evidence is contested whether Miller disclosed Red Nova's intent, and whether such a failure would violate API License 1.0's conflict-of-interest provision. Accordingly, neither party is entitled to summary judgment on SiteLink's claim that Red Nova violated API License 1.0's conflict-of-interest provision.

82.    In addition to SiteLink's claim that Red Nova breached the conflict-of-interest provision of API License 1.0, SiteLink, in passing and without further discussion, states that Red Nova "also breached [API License 1.0] by externally

storing tenant e-mail addresses received from SiteLink's API," in violation of section 3(N), which prohibits Red Nova from externally storing "tenant email addresses . . . or any other information sent or received from SiteLink's API." (Pl's. MSJ Br. 18 n.103; API License 1.0 6 § 3(N).) Red Nova responds that SiteLink misunderstands the evidence and technology at issue and that SiteLink received information from Red Nova and not the other way around. (Def's. MSJ Resp. 17–18.)

83. Even if the Court accepts Red Nova's characterization of the technology, a genuine issue of fact remains as to whether Red Nova externally stored e-mail addresses in violation of section 3(N). When initially asked in his deposition whether Red Nova collected tenant e-mail addresses, Miller stated that "I don't know. I—I really don't know. I don't know if e-mail addresses are taken or phone numbers." (Miller Dep. 157:18–20). Miller later stated that "*if* we're collecting e-mails, I'm sure they're stored." (Miller Dep. 158:5–6 (emphasis added).) When asked if such e-mails were stored outside of SiteLink, Miller responded "*I shouldn't say for sure*. I'm fairly certain they are saved in our website." (Miller Dep. 158:7–9 (emphasis added).)

84. The Court concludes that while SiteLink's claim based on section 3(N) of API License 2.1 presents a close call as to both liability and what damages, if any, might be recoverable as a result of such a breach, there is a genuine issue as to whether Red Nova externally stored tenant e-mail addresses in violation of API License 1.0 adequate to withstand summary judgment.

### b. Alleged breach of the Express Limited License

85. SiteLink also asserts that Red Nova breached the Express Limited License, which, according to SiteLink, began on January 13, 2014 and ended on February 28, 2014. SiteLink contends that a January 15, 2014 letter to SiteLink and Red Nova clients from SiteLink COO Markus Hecker states the terms of the license. That letter states:

> It has come to our attention that Red Nova Labs has violated our license agreement by deciding to directly compete with SiteLink . . . . This decision on Red Nova's part forces us to terminate our relationship with them. Previously, we provided Red Nova Labs with access to our servers along with proprietary tools at no charge. That access and tools permitted Red Nova Labs companies to make real time reservations, take tenant payments and provide for other tenant account management features. If you are using [Red Nova products or services], please call the alternate vendors listed on the attached page to change your provider. To help with your transition, these vendors have agreed to special pricing. *We have allowed Red Nova a grace period to ensure that you have continuity of service in your business.* The cutoff date for Red Nova interfaces to SiteLink is February 28, 2014.

(Pl's. Ex. 30, at 1 (emphasis added).) SiteLink further refers to Miller's deposition, where Miller describes Hecker's letter as stating that "SiteLink gave permission to certain customers to continue to use the API." (Miller Dep. 124:17–18.)

86. SiteLink asserts that Red Nova's license under API License 1.0 expired as soon as Red Nova began developing a competing FMS platform without disclosing this conflict of interest to SiteLink. SiteLink contends that the Express Limited License allowed Red Nova to use the API for mutual customers, but only between January 13, 2014 and February 28, 2014, and only to allow customers to transition from Red Nova to a new developer for ancillary services. (Pl's. MSJ Br. 19.) SiteLink

argues that when Red Nova instead encouraged mutual customers to ask for "indefinite extensions" for the Express Limited License to protect the customers' right to continue to work with Red Nova, (Pl's. MSJ Br. 19), Red Nova breached the license and violated the "implied covenant of good faith and fair dealing" found in "every contract." *Bicycle Transit Auth. Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (quoting *Brown v. Super. Ct. of Los Angeles Cty.*, 34 Cal. 2d 559, 564, 212 P.2d 878, 881, (1949)). While Red Nova does not dispute the validity of the Express Limited License, it contends that "there is no evidence" of Red Nova undertaking a duty of good faith and fair dealing, and that it never surrendered its right to communicate with mutual customers. (Def's. MSJ Resp. 15–16.)

87. The Court concludes that genuine issues of fact remain regarding the terms, duration, and breaches, if any, of the Express Limited License. Miller testified in an affidavit that he understood that the Express Limited License allowed Red Nova to "continue to be able to access the SiteLink API after February 28, 2014, on behalf of those customers who received extensions for [Red Nova] from SiteLink," and that Red Nova understood SiteLink's decision not to cut off access on March 1, 2014 to reflect "a change in [SiteLink's] position, . . . or that SiteLink had approved extensions for all mutual remaining customers." (Fourth Miller Aff. ¶ 24.) On the other hand, SiteLink maintains that the Express Limited License expired and was "not in effect" after February 28, 2014 such that Red Nova cannot imply any license to the contrary. (Pl's. MSJ Resp. 4.)

88.     The "presented facts . . . admit of more than one inference."' *Vizant Techs., LLC v. YRC Worldwide Inc.*, No. 15 CVS 20654, 2018 NCBC LEXIS 65, at *18 (N.C. Super. Ct. June 26, 2018) (quoting *Dutta v. St. Francis Reg'l Med. Ctr.*, 850 P.2d 928, 937 (Kan. Ct. App. 1993)).  Accordingly, the Court concludes that neither party is entitled to summary judgment on SiteLink's breach-of-contract claim based on the Express Limited License.

### c.     Alleged breach of API License 2.1

89.     SiteLink's final breach-of-contract claim is based on its contention that Red Nova violated section 3(R) of API License 2.1, which became effective April 28, 2014, and states that the licensee shall "not compete . . . with SiteLink."  (Pl's. Ex. 8 § 3(R).)  Although SiteLink did not argue that Red Nova breached section 3(R) in its summary judgment brief, both parties addressed this provision in subsequent briefing.  (Def's. MSJ Br. 19; Pl's. MSJ Resp. 3.)  Red Nova contends that it did not "compete" with SiteLink because Red Nova did not use the API with any product that competes with SiteLink.  (Def's. MSJ Br. 19.)  SiteLink responds that Red Nova's "tortured interpretation of the non-compete provision renders the provision meaningless."  (Pl's. MSJ Resp. 3.)

90.     Because SiteLink had no license provision against competition until it implemented API License 2.1 on April 28, 2014, any claim based solely on Red Nova's allegedly wrongful competition *prior* to April 28, 2014 must have an extra-contractual basis.  Further, there are disputed issues of fact regarding SiteLink's claim that Red Nova breached API License 2.1 by continuing to compete *after* April 28 2014,

including whether it was API License 2.1 or another express or implied agreement that governed Red Nova's API use. Neither party is entitled to summary judgment on SiteLink's claim based on Section 3(R) of API License 2.1.

**(5)** **Neither party is entitled to summary judgment on SiteLink's unjust enrichment claim.**

91. SiteLink argues that Red Nova was unjustly enriched during two periods: from May 2013 to January 13, 2014, and from February 28, 2014 to May 4, 2015. SiteLink asserts that Red Nova's unpaid-for benefit was its unauthorized use of SiteLink's API. (Pl's. MSJ Br. 20.) In addition to the preemption argument addressed above, Red Nova contends that SiteLink's unjust enrichment claim fails because express contracts govern Red Nova's use of the API. (Def's. MSJ Br. 19–20.)

92. "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid." *Collins v. Davis*, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761 (1984). "Under North Carolina law, a plaintiff demonstrates unjust enrichment by showing that 'it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party.'" *WJ Global LLC v. Farrell*, 941 F. Supp. 2d 688, 693 (E.D.N.C. 2013) (quoting *Se. Shelter Corp.*, 154 N.C. App. at 330, 572 S.E.2d at 206). "A claim of this type is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). Unjust enrichment is "not an appropriate remedy when there is an actual

agreement between the parties," *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998), because "an express contract precludes an implied contract with reference to the same matter." *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962).

93.     Clearly, the remedy of unjust enrichment is available only for those periods of time, if any, for which no contract was in force. *Id.* However, because the Court has recognized genuine issues of fact whether API License 1.0, the Express Limited License, or API License 2.1 governed Red Nova's access to the API during the times SiteLink claims Red Nova was unjustly enriched, neither party is entitled to summary judgment on SiteLink's unjust enrichment claim.

**(6)     <u>Neither party is entitled to summary judgment on SiteLink's tortious interference with existing contracts claim.</u>**

94.     Both parties move for summary judgment on SiteLink's claim for tortious interference with existing contracts. The elements of a claim for tortious interference with contract are

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700, 784 S.E.2d 457, 462 (2016) (quoting *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)).

95.     SiteLink contends that Red Nova tortiously interfered with the Customer License, which prohibits customers using SiteLink's FMS from utilizing a

service provider that competes with SiteLink. (Pl's. MSJ Br. 25; Pl's. MSJ Ex. 64.) SiteLink asserts that Red Nova, aware of the Customer License, acted without justification when it encouraged customers to ask for indefinite extensions of the Express Limited License. (Pl's. MSJ Resp. 8, 25.) SiteLink concludes that Red Nova's interference caused SiteLink actual pecuniary harm because SiteLink's "business was disrupted as its sales staff spent time contacting mutual customers and addressing their concerns, rather than selling [SiteLink's FMS]," and "SiteLink's engineers spent time developing a method to monitor" Red Nova's API use, "the cost of which exceeded $5,000." (Pl's. MSJ Br. 26.) While not challenging the existence, validity, or its knowledge of the Customer License, Red Nova asserts that there is no evidence either to support a finding that it acted without justification, or that SiteLink suffered any actual damages. (Def's. MSJ Br. 21.)

96. In North Carolina, "a third party who induces one party to terminate or fail to renew a contract with another may be held liable for malicious interference with the party's contractual rights if the third party acts without justification." *Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 317, 498 S.E.2d 841, 850 (1998) (quoting *Fitzgerald v. Wolf*, 40 N.C. App. 197, 199, 252 S.E.2d 523, 524 (1979)). "'North Carolina's case law paints a less-than-clear picture' when it comes to distinguishing between justified and unjustified interference with contract." *Lenders Funding, LLC v. Waim Mgmt. Co.*, No. 17 CVS 8592, 2018 NCBC LEXIS 67, at *5, 2018 NCBC 67 (N.C. Super. Ct. July 6, 2018) (quoting *K&M Collision, LLC v. N.C. Farm Bureau Mut. Ins. Co.*, 2017 NCBC LEXIS 109, at *21 (N.C. Super. Ct. Nov.

21, 2017).  Justification is "loosely" defined, *Lenders Funding*, 2018 NCBC LEXIS 67, at *5, and means any "just, lawful excuse" for taking action.  *Childress v. Abeles*, 240 N.C. 667, 675, 84 S.E.2d 176, 182 (1954).  Whether conduct is justified depends on "the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor, and the contractual interests of the other party."  *Robinson*, 129 N.C. App. at 317–18, 498 S.E.2d at 850 (quoting *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988)).

97.     As between business competitors, "the public interest [so] strongly favors protecting the freedom of individuals and entities to interfere with others' contractual rights . . . that the interfering conduct is deemed privileged."  *Lenders Funding,* 2018 NCBC LEXIS 67, at *6; *see also Peoples Sec. Life*, 322 N.C. at 221, 367 S.E.2d at 650 ("[C]ompetition in business constitutes justifiable interference . . . so long as it is carried on in furtherance of one's own interest and by means that are lawful.");  *Beverage Sys. of the Carolinas*, 368 N.C. at 700, 784 S.E.2d at 462 (noting that interference with a contract is "justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors").

98.     However, a competitive privilege is "conditional; the privilege 'is lost if exercised for a wrong purpose . . . where the act is done other than as a reasonable and bona fide attempt to protect the interest of the defendant.'"  *Hopkins v. MWR Mgmt. Co.*, No. 15 CVS 697, 2017 NCBC LEXIS 47, at *51 (N.C. Super. Ct. May 31, 2017) (quoting *Peoples Sec. Life*, 322 N.C. at 221, 367 S.E.2d at 650).  Thus, if a party

interferes "not to protect [its own] interests but instead to harm" its competitor, its interference will not be privileged. *Hopkins*, 2017 NCBC LEXIS 47, at *52.

99.     Regarding the element of actual damage, our appellate courts have held that "damages in . . . tortious interference with contract cases [are] actual monetary damages," and have suggested that such damages must be "connected to a contract right." *Burgess v. Busby*, 142 N.C. App. 393, 403–04, 544 S.E.2d 4, 9–10 (2001); *see also Francis v. Power Plant Maint., Inc.*, 264 F. Supp. 2d 350, 356–57, (M.D.N.C 2003) (dismissing a tortious interference claim brought by a former employee who had been reassigned to a different work location when there was no evidence of damages "other than [an] increased commute").

100.     As to whether Red Nova was justified in communicating with mutual customers, the record clearly demonstrates that SiteLink and Red Nova had become competitors at the times SiteLink contends Red Nova wrongly interfered with the Customer License. However, the record contains at least some evidence suggesting that Red Nova acted with an intent to harm SiteLink rather than only to protect its own competitive interests. For example, a jury could find that several of Miller's e-mails to Red Nova employees or customers demonstrate that Red Nova acted without justification in encouraging customers to breach the Customer License. (*See* Pl's. MSJ Ex. 35, RNL 07784 (January 21, 2014, e-mail from Miller to an employee stating that "our best defense is to destroy sitelinks [sic] business"); Pl's. MSJ Ex. 34, RNL08358 (February 14, 2014, e-mail from Miller telling a customer that he "wanted to beat "SiteLink at any cost"); Pl's. MSJ Ex. 35, RNL06564 (February 4, 2014, e-mail

from Miller to another employee stating "F*** Sitelink [sic], lets [sic] go get all their customers").)  Thus, there is a genuine issue whether Red Nova's conduct was justified.

101.  Further, while the Court concludes that SiteLink employees' *time* spent addressing customer concerns and developing an API monitoring system, (Pl's. MSJ Br. 26), does not constitute "actual *pecuniary* harm," *Burgess*, 142 N.C. App. at 404, 544 S.E.2d at 10 (emphasis added), SiteLink's expenses in implementing an API monitoring system are both pecuniary and sufficiently connected to the alleged breaches of the Customer License to constitute actual damage.

102.  Thus, while SiteLink's path to proving tortious interference is narrow, SiteLink "has brought forward sufficient evidence to permit a rational factfinder to conclude that [Red Nova]'s statements were . . . communicat[ed] not to protect [Red Nova]'s interest but instead to harm [SiteLink]," *Hopkins*, 2017 NCBC LEXIS 47, at *52, and that SiteLink suffered "actual pecuniary harm" as a result of Red Nova's statements.  *Burgess*, 142 N.C. App. at 404, 544 S.E.2d at 10.  Accordingly, neither party is entitled to summary judgment on SiteLink's intentional interference with contractual relations claim.

**(7)**     **Red Nova is entitled to summary judgment on SiteLink's claim for intentional interference with prospective economic advantage.**

103.  Only Red Nova moves for summary judgment on SiteLink's tortious interference with prospective economic advantage claim.

104.    Intentional interference with prospective economic advantage requires that a defendant "induce[ ] a third party to refrain from entering into a contract with [the p]laintiff without justification. Additionally, [the p]laintiff must show that the contract would have ensued but for" a defendant's interference. *Daimlerchrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002) (citation omitted).

105.    Red Nova asserts that SiteLink has failed to "identify even one lost sale" as a result of Red Nova's actions, (Def's. MSJ Br. 21), citing Lampe's testimony that he was not "aware of" SiteLink losing any contracts "as a result of any of the actions of Red Nova." (Lampe Dep. 106:5–9.) SiteLink does not appear to contest this assertion. Rather, SiteLink maintains that Red Nova's interference with prospective advantage caused the same harm as Red Nova's interference with the Customer License: namely, employees' lost time spent conducting damage control and developing an API monitoring system. (Pl's. MSJ Br. 26; Reply Supp. Pl's. Mot. Partial Summ. J. 10–11 ("Pl's. MSJ Reply"), ECF No. 131.2.)

106.    SiteLink's lack of evidence of any lost contract is fatal to its interference with prospective advantage claim. Our appellate courts have made clear that a plaintiff "must show that [a] *contract would have ensued* but for" a defendant's interference. *Daimlerchrysler*, 148 N.C. App. at 585, 561 S.E.2d at 286 (emphasis added). SiteLink has offered no evidence that it lost any contract as a result of Red Nova's conduct, and admits the opposite. Accordingly, the Court concludes that Red

Nova is entitled to summary judgment on SiteLink's claim for intentional interference with prospective economic advantage.

**(8)** **Red Nova is entitled to summary judgment on SiteLink's defamation per se claim.**

107. SiteLink's claim for defamation per se is based on Red Nova's Press Release regarding the Court's Consent Preliminary Injunction. (*See* Pl's. MSJ Br. 21–22.) Both parties move for summary judgment on this claim.

108. The Press Release states:

> The North Carolina Business Court issued an order today affirming Red Nova's ability to continue to provide website services for its clients who use SiteLink's management software.
> * * *
> SiteLink has sought an extremely broad injunction, attempting in effect to shut down Red Nova's ability to serve its storEDGE clients who use SiteLink. However, after the court hearing on SiteLink's motion [for preliminary injunction], SiteLink abandoned much of its request.
> * * *
> "Our priority is to protect our customers and help their businesses, and so we are very pleased that the court entered this order," said Dan Miller, President of Red Nova. . . . "We've worked hard to build our business into the leading provider of marketing solutions for self storage and believe that facility operators should have choice in selecting website providers. For too long, SiteLink's anticompetitive tactics have stifled innovation in the self storage industry and we are convinced that operators deserve better and more integrated technology solutions at competitive prices."

(Pl's. MSJ Ex. 49; *see also* Pl's. MSJ Br. 23.)

109. Defamation includes two distinct torts: libel and slander. *Tallent v. Blake,* 57 N.C. App. 249, 251, 291 S.E.2d 336, 338 (1982). Generally, written defamation constitutes libel. *Id.* To recover for defamation, "a plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's

reputation." *Boyce & Isley, PLLC v. Cooper*, 211 N.C. App. 469, 478, 710 S.E.2d 309, 317 (2011) (quoting *Tyson v. L'eggs Prods., Inc.*, 84 N.C. App. 1, 10–11, 351 S.E.2d 834, 840 (1987)). Truth is a defense to a defamation claim. *Id.*

110. North Carolina recognizes three categories of libel: (1) libel per se, which includes "obviously defamatory" publications; (2) publications that could be reasonably interpreted as either defamatory or not defamatory; and (3) libel per quod, which includes publications that are "not obviously defamatory" but which become so "when considered with innuendo, colloquium, and explanatory circumstances." *Renwick v. News & Observer Publ'g Co.*, 310 N.C. 312, 316, 312 S.E.2d 405, 408 (1984) (quoting *Arnold v. Sharpe*, 296 N.C. 533, 537, 251 S.E.2d 452, 455 (1979)).

111. The Court determines as a matter of law whether a publication is defamatory per se. *Renwick*, 310 N.C. at 317–18, 312 S.E.2d at 409. The statement "must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that [it] tend[s] to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." *Renwick*, 310 N.C. at 317–18, 312 S.E.2d at 409 (quoting *Flake v. Greensboro News Co.*, 212 N.C. 780, 786, 195 S.E. 55, 60 (1938) (emphasis omitted)). In the business context,

> the false words must touch the plaintiff in his special trade or occupation, and must contain an imputation necessarily hurtful in its effect on his business. That is to say, it is not enough that the words used tend to injure a person in his business. To be actionable *per se*, they must be uttered of him in his business relation. Defamation of this class ordinarily includes charges made by one trader or merchant tending to degrade a rival by charging him with dishonorable conduct in business.

*Badame v. Lampke*, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955) (citations omitted).

112. A statement "that does not 'assert any illegal or wrongful activity' by the plaintiff, generally does not rise to the level of defamation recognized under North Carolina law." *Diagnostic Devices, Inc. v. Doctor Diabetic Supply, Inc.*, No. 3:09CV135-GCM, 2010 U.S. Dist. LEXIS 1709, at *7 (W.D.N.C. Jan. 11, 2010) (quoting *Nucor Corp. v. Prudential Equity Grp., LLC.*, 189 N.C. App. 731, 737, 659 S.E.2d 483, 487 (2008)). Further, a statement cannot be libelous per se if it is "a pure expression of opinion," because expressions of opinion do not "assert actual fact[s]." *Nucor*, 189 N.C. App. at 736, 659 S.E.2d at 486 (quoting *Daniels v. Metro Magazine Holding Co.*, 179 N.C. App. 533, 539, 634 S.E.2d 586, 590 (2006)). The Court must consider "how the alleged defamatory publication would have been understood by an average reader" based solely on the face of the publication. *Nucor*, 189 N.C. App. at 736, 659 S.E.2d at 487.

113. Applying these principles, the Court concludes that none of the statements in Red Nova's press release constitute libel per se as a matter of law. Regarding the statement that "SiteLink's anticompetitive tactics have stifled innovation in the self storage industry," (Pl's. MSJ Ex. 49) the Court notes that while it is possible that an average reader might read "anticompetitive" to mean unlawful competition, it is just as likely that an average reader would understand "anticompetitive" to mean no more than "[h]aving a tendency to reduce or eliminate competition," Anticompetitive, Black's Law Dictionary (10th ed. 2014), and that here Red Nova reasonably believed that SiteLink was seeking to stifle innovation because

SiteLink did not want to compete with an innovative new product. The fact that SiteLink sought to enforce its API license in response to Red Nova's competition is undisputed. (Am. Compl. ¶ 126.) Red Nova's "anticompetitive" statement is not "susceptible of but one meaning" and therefore is not libel per se. *Renwick*, 310 N.C. at 317–18, 312 S.E.2d at 409.

114. Regarding Red Nova's statement describing the Consent Preliminary Injunction as "affirming Red Nova's ability to continue to provide website services for its clients who use SiteLink's [FMS]," the Court concludes that this statement is also capable of more than one interpretation and therefore is not libel per se. Further, the Court concludes that Red Nova's statements that SiteLink "sought an extremely broad injunction" and "abandoned much of its request" following the Court's injunction order constitute "pure expressions of opinion" and are therefore not libel per se. *Nucor*, 189 N.C. App. at 736, 659 S.E.2d at 486; *see also Kingsdown, Inc. v. Hinshaw*, No. 14 CVS 1701, 2016 NCBC LEXIS 15, at \*38 (N.C. Super. Ct. Feb. 17, 2016) (holding that statements describing ongoing litigation were "fairly understood as simply reflecting respective positions in the pending litigation and [the parties'] opinions concerning the strength of their respective cases").

115. For these reasons, Red Nova is entitled to summary judgment on SiteLink's defamation per se claim.

**(9) SiteLink's Section 75-1.1 claim must be narrowed.**

116. Both parties move for summary judgment on SiteLink's section 75-1.1 claim.

117. To sustain its section 75-1.1 claim, SiteLink must prove (1) that Red Nova "committed an unfair or deceptive act or practice," (2) that Red Nova's unfair or deceptive act or practice was "in or affecting commerce," and (3) that Red Nova's "act proximately caused injury" to SiteLink. *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013) (quoting *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711); *see also* N.C. Gen. Stat. § 75-1.1(a) (2017).

118. The first element is determined by the Court depending on a jury's findings of certain predicate acts. *See, e.g.*, *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, No. 00 CVS 10358, 2002 NCBC LEXIS 2, at *46–47 (N.C. Super. Ct. July 10, 2002) (citing *Bernard v. Cent. Carolina Truck Sales*, 68 N.C. App. 228, 314 S.E.2d 582 (1984)) (holding that trade secrets and tortious interference claims may support a 75-1.1 claim); *Nguyen v. Taylor*, 219 N.C. App. 1, 9, 723 S.E.2d 551, 558 (2012) (finding a section 75.1-1 violation where the defendant "defam[ed] [plaintiffs] while profiting at their expense"); *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 371, 618 S.E.2d 867, 871 (2005) (upholding a trial court's conclusion that a contract breach involving a false claim as a pretext for firing an employee satisfied 75-1.1).

119. SiteLink has not asserted a separate standalone claim. Accordingly, whether SiteLink's 75-1.1 claim survives depends on whether its defamation per se, tortious interference with contractual relations, or misappropriation of trade secrets claims survive, and on whether SiteLink can prove that aggravating circumstances accompanied Red Nova's alleged contract breaches such that the breaches rise to the

level of a 75-1.1 claim. *Cf. Krawiec v. Manly*, 370 N.C. 602, 613, 811 S.E.2d 542, 550 (2018) (quoting *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711) ("Plaintiffs made no further allegations of specific unfair or deceptive acts. Because we determined that plaintiffs failed to state a valid claim for tortious interference with contract or misappropriation of trade secrets, we necessarily must conclude that plaintiffs also failed to adequately allege that the . . . defendants 'committed an unfair or deceptive act or practice.'").

120.    Here, for reasons discussed above, SiteLink's defamation per se claim does not survive summary judgment, but its tortious interference with contractual relations, misappropriation of trade secrets, and breach-of-contract claims do.

121.    However, "a plaintiff must show substantial aggravating circumstances attending [a] breach [of contract] to recover under [section 75-1.1]." *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989). Substantial aggravating circumstances "generally involve forged documents, lies, and fraudulent inducements." *Forest2Market, Inc. v. Arcogent, Inc.*, No. 15 CVS 9547, 2016 NCBC LEXIS 3, at *14 (N.C. Super. Ct. Jan. 5, 2016) (quoting *Stack v. Abbott Labs., Inc.*, 979 F. Supp. 2d 658, 668 (M.D.N.C. 2013)). "A classic example of an aggravating circumstance is deception 'in the formation of the contract.'" *Post v. Avita Drugs, LLC*, No. 17 CVS 798, 2017 NCBC LEXIS 95, at *10 (N.C. Super. Ct. Oct. 11, 2017) (quoting *Bartolomeo*, 889 F.2d at 535). This Court has recognized that "[i]t is far more difficult to allege and prove egregious circumstances *after* the formation of the contract" because "disputes concerning the circumstances of the breach are often

bound up with one party's exercise of perceived rights and remedies under the contract." *Post*, 2017 NCBC LEXIS 95, at *10. Thus, a 75-1.1 violation "is unlikely to occur during the course of contractual performance." *Mitchell v. Linville*, 148 N.C. App. 71, 75, 557 S.E.2d 620, 624. Still, a breach may support a 75-1.1 claim if the breaching party "engaged in deceitful conduct in order to effectuate and conceal its breaches" and acted to "deter further investigation." *Sparrow*, 2014 NCBC LEXIS 70, at *44–45.

122. The Court now concludes that SiteLink has provided insufficient evidence in connection with its breach-of-contract claims to support a finding of "substantial aggravating circumstances." SiteLink does not argue and has not shown that Red Nova fraudulently induced it to enter any contract. Arguably, SiteLink has put forth some evidence that Red Nova acted to conceal its alleged breaches, (*see* Pl's. MSJ Ex. 41, RNL01270, ECF No. 79 (e-mail from Miller on March 15, 2014 encouraging Red Nova employees to "[k]eep sneaking all these" new customers)), but there is no evidence that Red Nova deterred investigation into any alleged breach. Accordingly, the Court concludes that the evidence is insufficient to create a genuine issue of fact whether "aggravating circumstances" accompanied any breach of contract.

123. In sum, Red Nova is entitled to summary judgment to the extent that SiteLink's 75-1.1 claim is based on the predicate acts of breach of contract or defamation per se. SiteLink's 75-1.1 claim survives to the extent it is based on its tortious interference and trade secrets claims.

**(10) Red Nova is not entitled to summary judgment at this time on SiteLink's declaratory judgment claim.**

124. SiteLink seeks a declaratory judgment pursuant to N.C. Gen. Stat. § 1-253 that "access to SiteLink's API is governed by the API User Agreement and further declaratory relief defining SiteLink's rights and legal obligations under the API User Agreement." (Am. Compl. ¶ 173.) Neither party has otherwise directly addressed this claim in their briefing or arguments. Accordingly, the Court defers consideration of SiteLink's claim for declaratory judgment at this time.

**D. Summary Judgment on Red Nova's Counterclaims**

125. SiteLink moves for summary judgment on Red Nova's remaining counterclaims for defamation per se, tortious interference with contract, and section 75-1.1 violations.

**(1) SiteLink is not entitled to summary judgment on Red Nova's defamation claim.**

126. Red Nova asserts a counterclaim against SiteLink for defamation in the form of both libel and slander per se based on SiteLink's statements to or in front of customers that Red Nova (1) violated API License 1.0 by competing with SiteLink, (Pl's. MSJ Ex. 30), (2) engaged in "flagrant, shameless, theft and abuse," (Def's. MSJ Resp. Ex. E), and (3) stole SiteLink's proprietary information and used it to develop storEDGE (collectively, "SiteLink's Statements"). (Bernath Dep. 53:23–54:17; *see also* Def's. Answer, Defenses, Am. Countercls. Pl's. First Am. Compl. ¶¶ 57–59.)

127. SiteLink does not directly challenge the contention that its statements could be defamatory per se, but rather argues that the record compels a finding that

its statements about Red Nova are not actionable because they are true. (Pl's. MSJ Br. 33–34; Reply Supp. Pl's. Mot. Partial Summ. J. 13.) SiteLink separately contends that summary judgment on Red Nova's defamation claim is appropriate because there is no evidence that any of its statements were a proximate cause of Red Nova's losses. (Pl's. MSJ Br. 34 n.196.)

128. As previously discussed, for a statement to be defamatory per se, it "must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that [it] tend[s] to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." *Flake*, 212 N.C. at 786, 195 S.E. at 60. As relevant here, "the false words must touch the plaintiff in his special trade or occupation, and must contain an imputation necessarily hurtful in its effect on his business." *Badame*, 242 N.C. at 757, 89 S.E.2d at 468. The statement must also "assert actual fact," *Nucor*, 189 N.C. App. at 736, 659 S.E.2d at 486, and "directly charge plaintiffs with an unauthorized act, or with improper, unlawful or unethical acts or practices. . . ." *Martin Marietta Corp. v. Wake Stone Corp.*, 111 N.C. App. 269, 280, 432 S.E.2d 428, 435 (1993). Truth is a defense to defamation. *Boyce*, 211 N.C. App. at 478, 710 S.E.2d at 317.

129. The Court concludes that each of SiteLink's Statements is defamatory per se if false. Regarding the statements that Red Nova "stole" from SiteLink, (Bernath Dep. 53:23–54:17), and engaged in "flagrant, shameless, theft and abuse" of SiteLink's API, (Def's. MSJ Resp. Ex. E), the Court concludes that both are clearly susceptible of only one meaning and implicate Red Nova in its trade. *See Ausley v.*

*Bishop*, 133 N.C. App. 210, 215, 515 S.E.2d 72, 76 (1999) *rev'd on other grounds*, 356 N.C. 422, 572 S.E.2d 153, 154 (2002) (holding that a statement that a counterclaim-plaintiff had "stolen" client files "undoubtedly had the capacity to harm [the counterclaim-plaintiff] in his trade or profession").

130.   The Court reaches the same conclusion regarding SiteLink's statement that Red Nova "violated our license agreement by deciding to directly compete." (Pl's. MSJ Ex. 30).   While there is a possible argument that some statements between business competitors may sometimes be protected by a conditional privilege, *see, e.g.*, *KBT Corp. v. Ceridian Corp.*, 966 F. Supp. 369, 374, (E.D. Pa. 1997) (noting in regard to trade disparagement claims that a "conditional privilege attaches to a commercially disparaging statement when the statement involves some interest of the person who publishes it"), the Supreme Court of North Carolina in *Ellis v. N. Star Co.*, 326 N.C. 219, 388 S.E.2d 127 (1990), made clear that a false statement accusing a business associate of a specific, wrongful, unauthorized act is actionable per se.   In *Ellis*, a defendant wrote a letter to its customers stating that it "did not authorize" a price list shared with those customers by the plaintiff.   326 N.C. at 224, 388 S.E.2d at 130.   The Supreme Court held that the letter could "only be read to mean that [the plaintiff] did an unauthorized act" so as to impeach the plaintiff in its trade and concluded that the defendant's letter was defamatory per se.   *Id.*

131.   The same result must follow in this case.   The statement that Red Nova "violated [the] licensing agreement by deciding to directly compete" is capable of one interpretation and directly touches Red Nova in its trade.   This statement also asserts

a provable fact; that Red Nova breached its contract by competing. *But see Nucor*, 189 N.C. App. at 737–38, 659 S.E.2d at 487 (affirming dismissal of a defamation per se claim when the defendant's statements did "not allege specific wrongful conduct" and did not contain "any alleged facts"). Accordingly, the Court concludes that SiteLink's statement that Red Nova violated the license agreement is defamatory per se if false.

132. In sum, because "no innuendo . . . is necessary to conclude" that each of SiteLink's Statements charge Red Nova with "committing contemptible business practices," *Boyce*, 153 N.C. App. at 32, 568 S.E.2d at 899, the Court concludes that each of SiteLink's Statements, if false, is defamatory per se.

133. However, the Court cannot conclude as a matter of law that any of SiteLink's statements are false. Indeed, the Court has already concluded that there remain genuine issues of fact whether, inter alia, Red Nova breached API License 1.0 (the license in effect at the time SiteLink sent the letter to customers stating that Red Nova had breached the agreement), and whether Red Nova misappropriated SiteLink's alleged trade secrets. Accordingly, SiteLink is not entitled to summary judgment to the extent Red Nova asserts a claim for defamation per se.

134. SiteLink also appears to argue that, even if some of its statements could be defamatory, SiteLink is still entitled to partial summary judgment because there is no genuine issue of fact that its statements were not the proximate cause of Red Nova's losses. (Pl's. MSJ Br. 34 n.196 (citing *Carotek, Inc. v. Kobayashi Ventures, LLC*, 875 F. Supp. 2d 313, 344 (S.D.N.Y. 2012), a case applying North Carolina law

and holding that plaintiffs seeking to recover under a libel per quod theory must prove special damages).)

135. The Court concludes that, to the extent that Red Nova's defamation claim depends on proof of actual damages, Red Nova has submitted sufficient evidence of proximate causation to survive summary judgment. (*See, e.g.*, Def's. MSJ Resp. Ex. H, RNL277266, ECF No. 121.22 (e-mail from customer ending her contract with Red Nova "due to the recent knowledge that the license agreement with SiteLink was violated"); RNL277262, ECF No. 121.16 (e-mail from customer ending her contract with Red Nova as "a result of the letter we received . . . from Site Link [sic]").) SiteLink admits that at least one customer left Red Nova because that customer learned that Red Nova "violated the API License Agreement or stole from SiteLink." (Pl's. MSJ Reply 13 n.53.) Accordingly, SiteLink is not entitled to summary judgment on Red Nova's defamation claim.

**(2)  SiteLink is entitled to summary judgment on Red Nova's tortious interference with existing contracts claim.**

136. Red Nova asserts a counterclaim against SiteLink for tortious interference with existing contracts based on SiteLink allegedly making false statements to Red Nova customers, including inducing those customers to cease doing business with Red Nova. (Am. Countercls. ¶¶ 48, 50.)

137. In its June 2016 Order & Opinion, the Court dismissed Red Nova's tortious-interference claim to the extent the claim was based on an assertion that the API license is "anticompetitive" or constitutes an illegal restraint of trade. *SiteLink*, 2016 NCBC LEXIS 45, at *33. The Court further concluded that SiteLink did not act

"without justification" merely by enforcing its API license. *Id.* (quoting *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992)).

138. SiteLink argues that it is entitled to summary judgment on the remaining parts of Red Nova's tortious-interference claim because SiteLink had a "legitimate business purpose" for making statements to divert Red Nova customers to other vendors, and "the right to determine 'with whom to deal.'" (Pl's. MSJ Br. 35 (quoting *SiteLink*, 2016 NCBC LEXIS 45, at *22).)

139. Red Nova stresses that SiteLink contacted not only mutual customers who used SiteLink's API, but *all* mutual customers, and that SiteLink had no legitimate business purpose for doing so. However, Red Nova does not contend that SiteLink contacted anyone with whom SiteLink did not have a contractual relationship.

140. As discussed above, interference with a contract is "justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." *Embree*, 330 N.C. at 498, 411 S.E.2d at 924. Indeed, "[c]ompetition in business constitutes a legitimate business interest where it is 'carried on in furtherance of one's own interests and by means that are lawful.'" *Veer Right Mgmt. Grp. Inc., v. Czarnowski Display Serv.*, No. 14 CVS 1038, 2015 NCBC LEXIS 13, at *14 (quoting *Peoples Sec.*, 322 N.C. at 221, 367 S.E.2d at 650). Conversely, "a wrong purpose exists where the act is done other than as a reasonable and bonafide attempt to protect the interests of the defendant which is involved," *Kuykendall*, 322 N.C. at 662, 370 S.E.2d at 387, such as when a party interferes "not

to protect [its own] interest but instead to harm" its competitor. *Hopkins*, 2017 NCBC LEXIS 47, at \*52.

141. The Court concludes that SiteLink is entitled to summary judgment on Red Nova's tortious interference with contracts claim because it is undisputed that Red Nova and SiteLink were, at the relevant time, competitors, and because SiteLink's contacting of mutual customers was lawful and carried out in furtherance of SiteLink's interests. *See Veer Right*, 2015 NCBC LEXIS 13, at \*14.

142. Here, SiteLink's contact was lawful because it was free to inform its customers about its cratering relationship with Red Nova. Further, such contact advanced SiteLink's interests because, as SiteLink notes, mutual customers who were using Red Nova for unrelated products may have expected some explanation for SiteLink and Red Nova's failed relationship and Red Nova's impending lack of API access. Finally, unlike SiteLink's tortious interference claim, where SiteLink put forth evidence that arguably suggests an improper motive, here, Red Nova has offered no similar evidence suggesting that SiteLink contacted customers to harm Red Nova instead of to protect its own interests.

143. Accordingly, SiteLink had a legitimate business interest in contacting mutual customers about ending Red Nova's API access and is therefore entitled to summary judgment on Red Nova's tortious interference with contracts claim.

**(3)** **Red Nova's Section 75-1.1 claim must be narrowed.**

144. SiteLink moves for summary judgment on the portions of Red Nova's section 75-1.1 counterclaim that survived the Court's June 2016 ruling. In that Order

& Opinion, the Court dismissed Red Nova's section 75-1.1 claim to the extent the claim is based on SiteLink's API license. *See SiteLink*, 2016 NCBC LEXIS 45, at *32.

145. The remaining portions of Red Nova's section 75-1.1 claim are based on its claims for defamation and tortious interference with contract, as well as allegations of unfair conduct based on SiteLink's "threatening, intimidating, and coercing actual and potential customers of Red Nova not to deal with Red Nova," including "making false statements to Red Nova's customers." (Am. Countercls. ¶ 68.) Red Nova is careful to point out that these alleged false statements "are different from [SiteLink's] defamatory statements." (Def's. MSJ Resp. 35.)

146. Similar predicate violations have been held to support a claim under section 75-1.1. *See e.g., Martin Marietta Corp. v. Wake Stone Corp.*, 339 N.C. 602, 603, 453 S.E.2d 146, 146–47 (1995) (holding that defamatory and injurious statements are "'unfair' within the meaning . . . of [the UDTP]" and may support a 75-1.1 claim); *Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 374, 555 S.E.2d 634, 642 (2001) (acknowledging that tortious interference with contracts may support a 75-1.1 claim).

147. However, Red Nova has cited no evidence of SiteLink's allegedly unfair statements upon which Red Nova's 75-1.1 claim is based, citing only the allegations of such statements contained in its counterclaims. (Def's. MSJ Resp. 34–35.) This is insufficient to create a genuine issue. Further, the Court has granted summary judgment in favor of SiteLink on Red Nova's tortious interference claim. Accordingly, SiteLink is entitled to summary judgment on Red Nova's 75-1.1 claim to the extent

such claim is based on Red Nova's allegations of SiteLink's unfair statements or tortious interference. Red Nova's 75-1.1 claim survives only to the extent that it is based on Red Nova's defamation claim.

## VI. CONCLUSION

148. For the reasons stated above, the parties' motions for partial summary judgment are GRANTED in part and DENIED in part as follows:

    a. SiteLink's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part as follows:

        i. DENIED as to SiteLink's claim for misappropriation of trade secrets;

        ii. DENIED as to SiteLink's CFAA claim;

        iii. DENIED as to SiteLink's breach-of-contract claims;

        iv. DENIED as to SiteLink's unjust enrichment claim;

        v. DENIED as to SiteLink's tortious interference with existing contracts claim;

        vi. DENIED as to SiteLink's claim for defamation per se;

        vii. DENIED as to SiteLink's claim for violations of 75-1.1;

        viii. DENIED as to Red Nova's defamation claim;

        ix. GRANTED as to Red Nova's tortious interference with existing contracts claim;

x. GRANTED as to Red Nova's 75-1.1 claim to the extent such claim is predicated on Red Nova's allegations of tortious interference or unfair statements. Otherwise, DENIED.

b. Red Nova's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part as follows:

i. GRANTED as to SiteLink's misappropriation of trade secrets claim to the extent it is based on Red Nova's misappropriation of SiteLink's FMS. Otherwise, DENIED;

ii. DENIED as to SiteLink's CFAA claim;

iii. DENIED as to SiteLink's computer trespass claim;

iv. GRANTED as to SiteLink's breach-of-contract claims to the extent such claims are based solely on Red Nova's wrongful unauthorized copying or distribution of the API. Otherwise, DENIED;

v. DENIED as to SiteLink's unjust enrichment claim;

vi. DENIED as to SiteLink's tortious interference with existing contracts claim;

vii. GRANTED as to SiteLink's intentional interference with prospective economic advantage claim;

viii. GRANTED as to SiteLink's defamation per se claim;

ix. GRANTED as to SiteLink's 75-1.1 claim to the extent SiteLink's claims are based on defamation per se or breach of contract. Otherwise, DENIED.

c. The parties shall on or before thirty days from the date of this Order & Opinion submit (1) a proposed schedule for any further pretrial proceedings and final trial; including (2) a report on whether a hearing on SiteLink's motions for contempt is necessary, and if so, two proposed dates on which the parties mutually agree for a hearing on such motions. The pre-trial schedule should be prepared consistent with Business Court Local Rule 12.3.

SO ORDERED, this the 20th day of August, 2018.

/s/ James L. Gale
James L. Gale
Senior Business Court Judge